IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

CHARLES COOLEY and )
BERNADETTE COOLEY, )
)
Plaintiffs, )
)
vs. )
)   CV-07-RRA-1643-W
WALTER INDUSTRIES, INC. d/b/a )
JIM WALTER RESOURCES, INC. and )
MICHAEL JOHNSON, )
)
Defendants. )

## MEMORANDUM OPINION

This is a civil case filed by the plaintiffs, Charles C. Cooley and Bernadette Cooley, against Jim Walter Resources, Inc. and Michael Johnson.  The amended complaint, filed on September 8, 2008, alleges a violation of the Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. §§ 4301-4333 ("USERRA"). Also set out are state law claims of intentional infliction of emotional distress (the tort of outrageous conduct), negligent retention, supervision, and training, and loss of consortium. All claims arise out of Charles Cooley's employment with Jim Walter.

The case is now before the court on the defendants' motion for summary judgment on Charles Cooley's claims.  (Doc. 38.) In her response to the motion for summary judgment, Bernadette Cooley stipulates that her only claim, loss of consortium, is due to be dismissed.

STANDARD OF REVIEW

In considering a motion for summary judgment, the court must determine whether

the moving party is entitled to judgment as a matter of law. Summary judgment may be granted only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P.56.  In making that assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  The burden of proof is upon the moving party to establish his prima facie entitlement to summary judgment by showing the absence of genuine issues and that he is due to prevail as a matter of law.  *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991).  Once that initial burden has been carried, the non-moving party may not merely rest upon his pleadings, but must come forward with evidence supporting each essential element of his claim.  *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Barfield v. Brierton*, 883 F.2d 923 (11th Cir. 1989).  Unless the plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issues of fact become immaterial and the moving party is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990).

## FACTS

Jim Walter operates a coal mine in Brookwood, Alabama, where Charles Cooley worked as an Inside Electrician. An Inside Electrician's main job is to keep all electrical equipment functioning so that coal may be extracted from the mine. Cooley performed this job until approximately 1982, when he was laid off. In October of 1983, Cooley was

2

rehired by Jim Walter and assigned to the Brookwood, Alabama No. 4 Mine, as an Inside Electrician, to assist in "long-wall" mining. (Cooley Decl. ¶7.)  The long-wall is a thousand foot or longer section of coal and rock that is mined for coal and is sometimes referred to as the "working face."  Part of an Inside Electrician's responsibility in relation to long-wall mining is to keep the equipment running.  This job is physically demanding. Also, because the air in areas where coal is mined is filled with large quantities of coal dust and other airborne debris which can be inhaled into the lungs, this job can be extremely dangerous. Even with a respirator, the dust and debris can cause respiratory illnesses. (Cooley Decl. ¶8.)  Also, there is an increased risk of serious accidental injury due to the size and weight of the equipment used in long-wall mining. (Cooley Decl. ¶9.)  Further, the work area is very confined and requires bending and stooping in order to reach equipment in need of repair. (Cooley Decl. ¶9.)   Cooley worked in this position until 1999, when he was re-assigned to work in a location the parties call "the battery barn." (Cooley Decl. ¶12.)

The battery barn contains much less coal dust and other debris. (Cooley Decl. ¶13). Equipment in need of repair is often brought to the battery barn by other workers, where it is easier to perform the repair work. (Cooley Decl. ¶13.) In most cases, the tools used to repair equipment in the battery barn are mechanized, which also makes repair work easier. (Cooley Decl. ¶14.) These tools are not available to an electrician assigned to the long-wall on the working face because of their size. (Cooley Decl. ¶14.)  Finally, work in the battery barn is much less dangerous because the worker is not required to do as much bending, stooping, and lying on his back. (Cooley Decl. ¶15.) Cooley states in his declaration that, for the most part, working in the "battery barn" is like working in a

3

garage.  (Cooley Decl. ¶16.)

On September 11, 2001, the plaintiff was employed with Jim Walter as an underground electrician in the Number Four Mine in Brookwood, Alabama. At that time, Cooley was working in the battery barn on the owl shift at pay grade level five. (Cooley Decl. ¶18.)   At some point following the terrorist attacks on the United States on September 11, 2001, Cooley, who was a member of the Alabama Army National Guard, was called to active duty. He remained on active duty until January 31, 2004.

About the middle of January, 2004, Cooley contacted Jim Walter's Mike Johnson to discuss Cooley's return to work. According to Cooley, he initially requested two weeks off following his release from active duty before returning to work. Johnson scheduled Cooley to return for re-training in mid-February, 2004. Because of money concerns, Cooley could not wait that long.

Within five or six days after speaking with Johnson, Cooley went to Jim Walter's offices.  Cooley asked to report to work early, and asked for his old job. (Cooley Dep. 38-39; Cooley Decl. ¶23.)[1] Cooley states that Johnson inquired about Cooley's health at this meeting.  Cooley informed Johnson that he was in good health and ready to return to work and that the only health concern was a minor shoulder injury he had sustained on active duty. (Cooley Decl. ¶4.) Johnson told Cooley, "if you were healthy when you left you need to be healthy when you return." Cooley informed Johnson that he was in good health and that he could do his old job. (Cooley Decl. ¶25.) Cooley has testified that he

---

[1]The defendant states that this statement is contrary to the plaintiff's testimony in his deposition, yet provides no reference to the evidence showing such inconsistency.

could have performed the duties and responsibilities of his position in the battery barn even with his shoulder injury. (Cooley Decl. ¶28.)

On the other hand, Cooley offered to work light duty until his shoulder healed completely. (Cooley Dep. 99-100; Cooley Decl. ¶26.) Also, Johnson testified that during the meeting Cooley asked him to sign a disability form stating that Cooley could not return to work because of his shoulder injury. (Johnson Depo. 52.) At that time Cooley's treating physician had not recommended surgery and was treating Cooley's injury conservatively. Later, when applying for benefits, Cooley represented to the military that he was incapacitated from February 1, 2004, to the end of April, 2004.

On January 30, 2004, Dr. Eric Tofil, Cooley's general care physician with the VA, stated in a progress note, "Signed a form for him stating that he is not fit to return to civilian duty which will in essence keep him active duty until his shoulder can be worked out." (Progress note, date January 30, 2009). On April 9, 2004, Dr. Amy Lott, Cooley's psychiatrist, further noted, "Patient is very concerned about his financial situation and wants to go back to work. We discussed the risk v. benefit, I do not believe [patient] is mentally or physically ready to return to work at present." (Progress note date, April 9, 2009).

Jim Walter never offered Cooley a light duty position and never made any effort to accommodate his shoulder injury.  It was never suggested that Cooley assume his old position or that he do other work of which he was capable. No one ever asked Cooley what work he could perform until his shoulder healed or whether his injury was temporary or permanent. Johnson testified that he thought his only obligation was to

place Cooley only in the same position, shift, and pay grade he had before he was called

up for active duty. (Johnson Dep. pp. 41-42).  Cooley then told Johnson that USERRA

guaranteed him his old position and required Jim Walter to accommodate his injury so

that he could perform his old job. Johnson told Cooley, "I am not here to give the

company's money away." (Cooley Decl. ¶27.)  Johnson also stated, "well that's why we

have lawyers." (Cooley Dep. 47-48.)[2]

In late January of 2004, Cooley began the application process to receive

incapacitation benefits from the Army.  The undisputed evidence shows that Cooley

applied for and received incapacitation benefits from the State Military Department for

the period of February 1, 2004, to April 9, 2004. (Incapacitation Benefits Award Letter,

dated February 1, 2004). Cooley signed his application for benefits on February 3, 2004.

(Incapacitation Monthly Claim Form, dated February 3, 2004). On this application,

Cooley stated the dates of his incapacitation as being from "February 1, 2004 to ?" *Id.*

Johnson signed this document, in the "Employer's Verification Section," on February 4,

2004. *Id.* Part of this process was having the treating physician, Dr. Eric Tofill, certify that

Cooley was not fit to return to civilian duty until his shoulder problem was corrected. On

February 3, 2004, Cooley signed an application for incapacitation benefits, and Johnson

signed this document the next day, February 4, 2004. Thus, Cooley represented to the

military that he was incapacitated from February 1, 2004, to the end of April, 2004.

On March 2, 2004, Dr. Amy Lott of the Veteran's Administration diagnosed

---

[2]Johnson denies that he made these statements.

Cooley with Major Depressive Disorder, Single/Moderate. On March 18, 2004, this diagnosis was elevated to Major Depressive Disorder, Single/Severe. On April 1, 2004, Dr. Lott diagnosed the plaintiff as having PTSD.

On March 9, 2004, the Guard approved Cooley's application for incapacitation benefits, for the period from February 1, 2004, to April 30, 2004. (Incapacitation Benefits Award Letter, dated February 1, 2004). These benefits were continued from May 1, 2004 until July 30, 2004. (Incapacitation Benefits Award Correspondence, dated May 1, 2004). Cooley returned to work in August, 2004, after this period of benefits ended. (Cooley Depo. 59.) Cooley's benefits were limited to an amount equal to his lost civilian earned income or military pay and allowances, whichever was less. At a rate of approximately $1,000.00 a week, Cooley received $23,056.99. He would have earned approximately $32,667.30 at his old job. (Cooley Decl. ¶31).

In June, 2004, Cooley had shoulder surgery, and was released to return to work on August 23, 2004, with restrictions. Cooley's Orthopedic Surgeon, Ouida L. Brown, noted, "The patient was given a note to return to work on light duty, no prolonged overhead activities and no lifting greater than 10-15 pounds." (Progress Note, dated August 23, 2004).

On August 4, 2004, Cooley, while at home, called Dr. Lott and told him that he had a gun in his hand and was having auditory and visual hallucinations of dead soldiers asking him to take their place among the dead. Cooley was hospitalized as a result of this event.

In August of 2004, Cooley again presented himself for work. Over Cooley's

protests, the defendant assigned Cooley to an Inside Electrician's position on the No. 4 section extracting coal. (Cooley Decl. ¶32). Cooley had not worked in this area on a regular basis since 1980. Although Cooley's "old position" in the battery barn was still open, Johnson told Cooley that the "battery barn" is a location, not a position, and that Cooley's immediate supervisor gave Cooley daily assignments. (Johnson Depo. 67, 73.)

Before he left for active duty, Cooley worked the 4-D5 shift, which means that he worked four shifts Monday through Thursday, one overtime shift on Saturday, and one double-time shift on Sunday. In his newly assigned position of Inside Electrician on the No. 4 section extracting coal, Cooley worked a regular five-day schedule with no time and a half and no double time. Cooley contends that this scheduling cost him $403.30 less pay a week for approximately three or four months. (Cooley Decl. ¶35.) The plaintiff's pay stub for the pay period ending December 19, 2004 shows that, after taxes, the plaintiff averaged just under $1,000.00 per week for the year to date.

Upon his return to Jim Walter, Cooley began missing work days, often due to doctor visits or military training. Cooley testified that Johnson met with him and threatened to fire him for excessive absences and doctors' visits. (Cooley Depo. 97.)[3] Johnson met with Cooley pursuant to the company's excessive absenteeism policy. Cooley filed a union grievance over this event. The union denied Cooley's grievance. Johnson told Cooley, "if I was that sick I would be on disability." (Cooley Dep. 115.) All absences that Cooley thought should have been excused were removed from his record.

---

[3]Johnson denied that he ever threatened to terminate Cooley for absenteeism.

In February, 2005, Cooley bid on and was awarded a new position, which Cooley testified was "a two dollar reduction in pay." (Cooley Decl. ¶42.)[4] Cooley stopped working in January, 2006.  On April 20, 2006, Dr. Lott sent a note to the VA stating that Cooley was permanently disabled and could not work. Cooley resigned from Jim Walter on May 15, 2006. Cooley had been an employee of Jim Walter for approximately 29 years.

In July of 2005, upon the advice of one of his commanding officers, Cooley lodged a complaint against the defendant with the Department of Labor for the compensation he claimed he should have received. The Department of Labor conducted an investigation and asked, by correspondence, for the defendant to provide certain information and to respond to Cooley's allegations that he was not re-employed promptly, that he did not receive accommodation for his shoulder injury, and that he was not placed in the proper position and did not receive proper pay.

In its July 27, 2005, letter in response, Jim Walter stated:

> Cooley returned from military duty on January 31, 2004, but immediately requested a fourteen day (14) recovery leave from this employer. On February 3, 2004, he presented the employer with a military doctor's form indicating he could not return to work due to the disability from an accident incurred while on military duty.

(Doc. 41-1.)  Jim Walter also stated that it had not violated USERRA and that it had no duty to accommodate Cooley.

## ANALYSIS

---

[4]The plaintiff does not specify, but the court assumes that he means a two dollar <u>per hour</u> reduction in pay.

*The USERRA Claims*

Cooley has brought a claim under 38 U.S.C. §§ 4311 and 4312.   Section 4311

provides:

> A person who is a member of, applies to be a member of, performs, has performed, applies to perform, or has an obligation to perform service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership, application for membership, performance of service, application for service, or obligation.

38 U.S.C. § 4311(a).  The Eleventh Circuit has explained what a plaintiff must show:

> Section 4311 clearly mandates proof of discriminatory motive. *See Sheehan v. Dep't of the Navy*, 240 F.3d 1009, 1013 (Fed.Cir.2001); *Brandsasse v. City of Suffolk, Va.*, 72 F.Supp.2d 608, 616-17 (E.D.Va.1999). The standard of proof is the so-called "but for" test. *Sheehan*, 240 F.3d at 1013.
>
> In order to establish his prima facie case, [the plaintiff] must show by a preponderance of the evidence that his protected status was a motivating factor in . . . decision not to hire him. *Brandsasse*, 72 F.Supp.2d at 617. A motivating factor does not mean that it had to be the sole cause of the employment action. Instead, "it is one of the factors that 'a truthful employer would list if asked for the reasons for its decision.' " *Id.* (citation omitted); *see also Smith v. School Bd. of Polk County, Fla.*, 205 F.Supp.2d 1308, 1314 (M.D.Fla.2002). "Indeed, [m]ilitary status is a motivating factor if the defendant relied on, took into account, considered, or conditioned its decision on that consideration." *Brandsasse*, 72 F.Supp.2d at 617 (citation omitted); see also *Smith*, 205 F.Supp.2d at 1314-15. Circumstantial evidence plays a critical part in these cases, "for discrimination is seldom open or notorious." *Sheehan*, 240 F.3d at 1014. The court can infer discriminatory motivation under the USERRA from a variety of considerations, such as:
>
>> proximity in time between the employee's military activity and the adverse employment action, inconsistencies between the proffered reason and other actions of the employer, an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity, and disparate treatment of certain employees compared to other employees with similar work records or offenses.
>
> *Id.* "When the employee has met this burden, the burden shifts to the employer to prove the affirmative defense that legitimate reasons, standing alone, would have induced the employer to take the same adverse action." *Id.* This burden-shifting framework "applies to both so-called 'dual motive' cases and so-called 'pretext'

10

cases." *Id.* "Thus in USERRA actions there must be an initial showing by the employee that military status was at least a motivating or substantial factor in the agency action, upon which the agency must prove, by a preponderance of evidence, that the action would have been taken despite the protected status." *Id.*

*Coffman v. Chugach Support Services, Inc.*, 411 F.3d 1231, 1238-1239 (11th Cir. 2005).

The court further stated:

Section 4312 addresses the right of reemployment for persons who serve in the military. Veteran reemployment statutes "date from the nation's first peacetime draft law, enacted in 1940." *Leib v. Georgia-Pacific Corp.*, 925 F.2d 240, 242 (8th Cir.1991). Congress intended for "[t]he statutory right to reinstatement ... to bolster the morale of those serving their country and to facilitate their reentry into the highly competitive world of job finding without the handicap of a long absence from work." *Id.* (quotation and citation omitted). Unlike section 4311, this provision does not require an employee to show any discriminatory animus. See *Wrigglesworth*, 121 F.Supp.2d at 1134-35. Section 4312 provides, in pertinent part, that:

(a) Subject to subsections (b), (c), and (d) and to section 4304, any person whose absence from a position of employment is necessitated by reason of service in the uniformed services shall be entitled to the reemployment rights and benefits and other employment benefits of this chapter if-

(1) the person (or an appropriate officer of the uniformed service in which such service is performed) has given advance written or verbal notice of such service to such person's employer;

(2) the cumulative length of the absence and of all previous absences from a position of employment with that employer by reason of service in the uniformed services does not exceed five years; and

(3) except as provided in subsection (f), the person reports to, or submits an application for reemployment to, such employer in accordance with the provisions of subsection (e).

. . .

(d)(1) An employer is not required to reemploy a person under this chapter if-

(A) the employer's circumstances have so changed as to make such reemployment impossible or unreasonable;

11

(B) . . . such employment would impose an undue hardship on the employer;

. . .

(2) In any proceeding involving an issue of whether-

(A) any reemployment referred to in paragraph (1) is impossible or unreasonable because of a change in an employer's circumstances,

(B) any accommodation, training, or effort referred to in subsection (a)(3), (a)(4), or (b)(2)(B) of section 4313 would impose an undue hardship on the employer, or

(C) the employment referred to in paragraph (1)(C) is for a brief, nonrecurrent period and there is no reasonable expectation that such employment will continue indefinitely or for a significant period,

the employer shall have the burden of proving the impossibility or unreasonableness, undue hardship, or the brief or nonrecurrent nature of the employment without a reasonable expectation of continuing indefinitely or for a significant period.

38 U.S.C. § 4312 (2002). Section 4312 also imposes upon the employee a requirement to timely notify the employer of his intention to return to work. 38 U.S.C. § 4312(e)(1).

*Coffman*, 411 F.3d at 1235-1236 (11th Cir. 2005) (quoting 38 U.S.C. § 4312).

The plaintiff states that "[i]n or around February 2004, Cooley reapplied for his old position as a Mine Electrician in the Battery Barn." (Doc. 1, p. 3.) The plaintiff claims that he was 1) "initially and unlawfully denied reemployment" and 2) "once reemployed [he] was placed in a position that was less advantageous than the position he had previously occupied." (Doc. 43-2, p. 18.)

Section 4312

*Initially and Unlawfully Denied Reemployment*

The evidence, when viewed in the light most favorable to the non-movant plaintiff,

12

shows that about a week before the plaintiff was released from active duty Cooley called Johnson to discuss Cooley's return to work. The plaintiff thought that he "contacted Mike Johnson maybe a week before – before I was released in January – I mean in February." (Cooley Depo. 37.)   In his affidavit, the plaintiff states, "My official release date from active duty was January 31, 2004."   (Cooley Affid. 6.)   He further states that "[i]n the latter part of January 2004, I contacted Johnson . . . and informed him that I would probably take a couple weeks off after my January 31, 2004, release date and then return to work."   (Cooley Affid. 6.)   Accordingly, the evidence, when viewed in the light most favorable to the plaintiff, shows that this initial conversation took place around January 24, 2004, one week before the plaintiff's release date. It is undisputed that, as a result of this conversation, Johnson scheduled Cooley to return to Jim Walter for re-training on February 14, 2004.[5]

Curiously, the evidence seems to indicate that the plaintiff asked for his job back and immediately was promised it. Otherwise, the purpose for scheduling re-training for the plaintiff on February 14, 2004, would not make sense.

The parties dispute what occurred between the time the plaintiff was scheduled to come back to work and the time he did come back to work.   Cooley testified, "after I stayed off for five or six days, I kind of realized that I would be without an income for – for a while. So I went to the mine to tell them that I was coming back." (Cooley Depo.

---

[5]See Defendant's Statement of Undisputed Facts at paragraph 3, and the plaintiff's response.   The purpose of this "retraining" is unclear.   There is no evidence that Johnson, at this time, intended to place the plaintiff into a position he had never occupied.

39.)  The plaintiff personally met with Johnson when he went to the mine.  The parties agree that this meeting occurred within five or six days after speaking with Johnson over the phone. That would necessarily mean that the meeting took place in the month of January, 2004, more specifically, around January 29 or January 30.

The plaintiff states that he asked to report to work earlier than February 14, the date specified by Johnson . (Cooley Dep. 38-39; Cooley Decl. ¶.) Johnson inquired about Cooley's health at this time.  Cooley told Johnson that he was in good health and ready to return to work and that the only health concern he might have was a minor shoulder injury he had sustained on active duty. (Cooley Decl. ¶4.) Johnson told Cooley, "if you were healthy when you left you need to be healthy when you return." Cooley even offered to work light duty until his shoulder healed completely. (Cooley Dep. 99-100; Cooley Decl. ¶26.) Johnson never specifically said that Cooley could not return to work immediately.  (Cooley Depo. 48.)

Johnson testified that, at the face-to-face meeting with Cooley, Johnson was prepared to re-employ Cooley in his previous position, but Cooley informed him that he could not return to work due to his shoulder injury. Johnson testified that Cooley asked him to sign a disability form, indicating that Cooley could not return to work due to the shoulder injury.

The undisputed evidence shows that Cooley applied for and received incapacitation benefits from the State Military Department for the period of February 1, 2004, to April 9, 2004. (Incapacitation Benefits Award Letter, dated February 1, 2004). Cooley signed his application for benefits on February 3, 2004.  (Incapacitation Monthly Claim Form,

dated February 3, 2004). On this application, Cooley stated that his incapacitation began on February 1, 2004, with an indeterminate end date. *Id.* Johnson signed this document, in the "Employer's Verification Section," on February 4, 2004. *Id.*

On March 9, 2004, the Guard approved Cooley's application for incapacitation benefits, for the period of February 1, 2004, to April 30, 2004. (Incapacitation Benefits Award Letter, dated February 1, 2004). The benefits awarded were limited to "an amount equal to your lost civilian earned income or military pay and allowance." Thus, Cooley represented to the military that he was incapacitated from February 1, 2004, to the end of April. These benefits were continued from May 1, 2004, to July 30, 2004. (Incapacitation Benefits Award Correspondence, dated May 1, 2004). Cooley returned to work in August, after this period of benefits ended. (Cooley Depo. 59.)

The defendant states that the documentary evidence supports Johnson's version of the facts. That assertion is based solely on the fact that the defendant insists the face-to-face meeting with Johnson occurred in early February. Using that date, according to Cooley, he had already determined that he was disabled and could not work before he met with Johnson. The evidence, however, indicates that this meeting occurred several days before the plaintiff signed the disability form. The plaintiff's evidence is that he did not apply for incapacitation benefits until <u>after</u> he was denied re-employment.[6]

Although Johnson never told the plaintiff that he would not re-hire him, a reasonable jury could conclude that the words "if you were healthy when you left you

---

[6]The inconsistency in first asking to be employed, and then, days later, applying for incapacitation benefits, is addressed *infra*.

need to be healthy when you return" meant that he would not allow the plaintiff to return at the time of the face-to-face meeting. Therefore, the court must determine whether the decision not to allow the plaintiff to return to work immediately could be found to constitute a violation of Section 4312.

The evidence, when viewed in the light most favorable to the plaintiff, shows that Cooley met with Johnson and stated that he was ready and able to return to work. Even if the evidence showed that Cooley had stated to Johnson that his disability prevented him from working in his old position, the defendant was still required to provide the plaintiff with a reasonable accommodation.[7] Title 38 U.S.C. § 4313(a)(3)(A) and (B) provides in pertinent part:

> (a) . . . [A] person entitled to reemployment under section 4312, upon completion of a period of service in the uniformed services, shall be promptly reemployed in a position of employment in accordance with the following order of priority:
>
> . . .
>
>> (2) Except as provided in paragraphs (3) and (4), in the case of a person whose period of service in the uniformed services was for more than 90 days--
>>
>> (A) in the position of employment in which the person would have been employed if the continuous employment of such person with the employer had not been interrupted by such service, or a position of like seniority, status and pay, the duties of which the person is qualified to perform; or
>>
>> (B) in the position of employment in which the person was employed on the date of the commencement of the service in the uniformed services, or a position of like seniority, status and pay, the duties of which the person is qualified to perform, only if the person is not qualified to perform the duties of a position referred to in subparagraph (A) after reasonable efforts by the employer to qualify the person.

---

[7]The plaintiff makes this argument in his brief but the defendant does not respond to it.

16

(3) In the case of a person who has a disability incurred in, or aggravated during, such service, and who (after reasonable efforts by the employer to accommodate the disability) is not qualified due to such disability to be employed in the position of employment in which the person would have been employed if the continuous employment of such person with the employer had not been interrupted by such service--

(A) in any other position which is equivalent in seniority, status, and pay, the duties of which the person is qualified to perform or would become qualified to perform with reasonable efforts by the employer; or

(B) if not employed under subparagraph (A), in a position which is the nearest approximation to a position referred to in subparagraph (A) in terms of seniority, status, and pay consistent with circumstances of such person's case.

38 U.S.C. § 4313(a).

It is undisputed that the defendant made no effort to accommodate the plaintiff's alleged disability. However, the plaintiff's contention now that he was able to work, or able to be accommodated, is in direct contradiction to his representations to the military that he was completely incapacitated as of February 1, 2004. Cooley's allegations that he was able to work are further discredited by several medical records from Cooley's VA doctors. On January 30, 2004, Dr. Eric Tofil, Cooley's general care physician with the VA, stated in a progress note, "Signed a form for him stating that he is not fit to return to civilian duty which will in essence keep him active duty until his shoulder can be worked out." (Progress note, date January 30, 2009). On April 9, 2004, Dr. Amy Lott, Cooley's psychiatrist, further noted, "Patient is very concerned about his financial situation and wants to go back to work. We discussed the risk v. benefit, I do not believe [patient] is mentally or physically ready to return to work at present." (Progress note date, April 9, 2009). On August 23, 2004, following his surgery, Cooley's Orthopedic Surgeon, Ouida

17

L. Brown, noted, "The patient was given a note to return to work on light duty, no prolonged overhead activities and no lifting greater than 10-15 pounds." (Progress Note, dated August 23, 2004). Immediately thereafter, Cooley returned to work at Jim Walter. The medical records clearly refute Cooley's claims that, when he met with Mike Johnson, he was ready, willing, and able to return to work.

The question is whether Cooley's behavior and statements that he was unable to return to work legally forbids him from contending to a jury that he was in fact able to return to work. Cooley is not so precluded. The jury is free to decide whether Cooley was telling the truth when he told Johnson he was able to work or he was telling the truth when he told the government that he was unable to work. Even though the jury's ability to find that Cooley was able to work is complicated by the medical evidence that states otherwise, it is still believed that a jury could find, in spite of the medical evidence, that Cooley could have worked. A medical doctor's opinions are often based upon his patient's statement of how he feels. The plaintiff argues that he applied for disability only <u>after</u> the defendant refused to hire him. This argument appears to imply that the plaintiff could work but, when he was denied employment, he had to claim, falsely, that he could not work, if he were to have an income.

A jury's freedom to find that Cooley was able to work might not exist if it was undisputed that Cooley had represented to <u>Johnson</u> that he was unable to work. However, the evidence, <u>when viewed in the light most favorable to the plaintiff</u>, is that Cooley did not tell Johnson that he was unable to work until Johnson refused to rehire him. The plaintiff told Johnson that he had a shoulder problem, but that he could still do

his job. Johnson stated that an employer is under no duty to accommodate a returning service person who had sustained an injury while on military duty.

The defendant last argues that any claim that he might have under USERRA is moot because the plaintiff received incapacitation benefits during the time he was denied employment. The only USERRA case cited by the defendant in support of this argument is *Woodard v. New York Health and Hospitals Corp.*, 554 F. Supp. 2d 329 (E.D.N.Y. 2008). In *Woodard*, the plaintiff alleged that the defendant discriminated against her in the form of a "reduced pay increase" that was inconsistent with a raise "awarded to similarly situated non-military employees." *Woodard*, 554 F.Supp.2d at 352. The District Court wrote:

> Woodard's claim is moot because, following the retroactive pay increase awarded to her in 2004, there is no injury that remains to be redressed here. The remedies available under USERRA include injunctive relief and compensatory damages in the form of lost wages and benefits. See 38 U.S.C. § 4323(d)(1) (A)-(B). These remedies allow a court to ensure that employers comply with the provisions of USERRA, and to make an employee whole when those provisions are violated. USERRA also provides an additional "liquidated damages" remedy that can double a plaintiff's compensatory damages to punish an employer's willful misconduct. 38 U.S.C. § 4323(d)(1)(C). *See also Schmauch v. Honda of Am. Mfg.*, 311 F.Supp.2d 631, 635 (S.D.Ohio 2003) (explaining USERRA's remedial scheme). But USERRA does not provide for any other punitive damages or statutory penalties. *See Morris-Hayes v. Bd. of Educ.*, 423 F.3d 153, 160 (2d Cir.2005) (holding that a Section 1983 suit for damages is unavailable to enforce the rights created by USERRA, because "USERRA provides a comprehensive remedial scheme to ensure the employment and reemployment rights of those called upon to serve in the armed forces of the United States"); *Schmauch*, 311 F.Supp.2d at 636 (concluding that public policy tort claim for punitive damages is precluded by USERRA's comprehensive remedial scheme). Because plaintiff has pointed to no remedy that would be available to her, even if the court found that HHC had discriminated against her by deferring her pay increase on account of her military service, plaintiff's first cause of action must be dismissed as moot.

*Id.* at 354-355.

*Woodard* is distinguishable because, in the instant case the plaintiff has been

19

compensated by a third party. In *Woodard*, the plaintiff had been compensated by her employer, who was the offending party. The defendant cites no case in which a third-party payment made to a plaintiff would absolve the defendant from liability under the statute. Further, even if the payments by the Army could moot the claims for compensatory damages, they would not affect the liquidated damages available to the plaintiff. Therefore, summary judgment is inappropriate as to the Section 4312 claims for the plaintiff not being re-hired at his first face-to-face meeting with Johnson.

### *Placed in a Less Advantageous Job*

The plaintiff also claims a violation of Section 4312 occurred because "once reemployed [the plaintiff] was placed in a position that was less advantageous than the position he had previously occupied." Section 4313 provides:

> (a) . . . [A] person entitled to reemployment under section 4312, upon completion of a period of service in the uniformed services, shall be promptly reemployed in a position of employment in accordance with the following order of priority:
>
> . . .
>
>> (2) Except as provided in paragraphs (3) and (4), in the case of a person whose period of service in the uniformed services was for more than 90 days--
>>
>> (A) in the position of employment in which the person would have been employed if the continuous employment of such person with the employer had not been interrupted by such service, or a position of like seniority, status and pay, the duties of which the person is qualified to perform[.]

38 U.S.C. § 4313(a)(2)(A). The plaintiff contends that Jim Walter violated this directive because "when he returned to work in August 2004, he should have been placed in the 'battery barn.'" (Doc. 43-1, p. 31.)

There is no dispute that the plaintiff was re-hired as an Inside Electrician, on the

owl shift, at pay grade 5, the exact same position he held prior to leaving for active duty.

(Cooley Depo. 64-67.)   However, the plaintiff argues:

> Here, before Cooley was summoned to active duty he worked as an electrician in the "battery barn." Cooley testified that the "battery barn" is a desired assignment because the "working conditions" are garage like in that the work there was less dangerous to his health, less physically taxing, and easier because of the equipment and tools available. By contrast extracting coal was much more dangerous and physically taxing. Upon his return, Cooley was reassigned to the No. 4 section extracting coal, a position he had not worked since 1980. Moreover, his old position in the battery barn was still available, but was not made an option for him.
>
> . . .
>
> Before he left for active duty military service in September 2001, Cooley worked the 4-D-5 shift which meant that he worked 4 shifts — Monday through Thursday — and was off on Friday. In addition he worked one overtime shift on Saturday and one double-time shift on Sunday. Cooley's pay for his regular shift was $161.32 per day, overtime pay for the Saturday shift was $241.98, and his double-time pay for the Sunday shift was $322.64. Cooley was not reinstated to this shift. Instead he was returned to a regular Monday through Friday schedule where he received no overtime or double-time. By not being placed on his prior shift Cooley lost $403.30 per week in pay. In December 2004, Cooley was allowed to go back to the 4-D-5 shift; but only after he had complained to his union. As such it should be held that the Defendants failed to reinstate Cooley to a position of similar pay under USERRA.

(Doc. 43-1, pp. 34-35.)

The law does not require that the plaintiff be given a certain shift or work location when he returns to work. The plaintiff asserts that a change in shift or work location amounts to different "seniority, status, [or] pay" than he had before he left for military service, but the plaintiff cites no authority or for this assertion. The plaintiff does cite three cases he states are instructive of what courts consider to be "like status." (Doc. 43-2, p. 33.)

In *Trusteed Funds v. Dacey*, 160 F.2d 413, 419-420 (1ˢᵗ Cir. 1947), the court

interpreted the old Selective Training and Service Act of 1940, the precursor to USERRA,

and first described the so-called "escalator principle".  The court wrote:

> On October 4, 1938, a five-year written contract of employment was executed by appellant and Dacey, under which Dacey was to serve as publicity manager 'to manage and to supervise the publicity activities of the Company, and to perform such other duties and render such other services as may be required of him in the best interests of the Company, subject to the general direction and supervision of the General Manager of the Company and under the control and to the satisfaction of the Board of Directors of the Company.' The company was given the option to extend the agreement for a further period of five years from October 4, 1943, upon the same terms and conditions, upon giving notice in writing of its intention so to do to the said Dacey on or before July 1, 1943. No such notice was ever given. Under the contract, Dacey was compensated solely on a commission basis. He received 7% of all the founding fee income of the company. By certain amendments executed on March 15, 1941, and May 12, 1942, he also received 50% of the founding fees derived from sales of plans effected by his personal efforts.

*Dacey*, 160 F.2d at 416.  In determining that the position offered the plaintiff, when he

returned from active duty, was not of like seniority, status, and pay, the court wrote:

> The district court made no findings on this point. We cannot say that the evidence as a matter of law would require a finding that appellant had made an offer of a position of like seniority, status, and pay. Apart from the fact that the position offered was to be in another city, which might be a relevant factor, *see Salter v. Becker Roofing Co.*, D.C.M.D.Ala. 1946, 65 F.Supp. 633, the new job would have required Dacey to start from scratch, recruiting a sales force, and building up the business in the region assigned. Though he would have been compensated by an overriding commission on all the plans sold through the regional office, he would not have received a percentage of all the founding fee income of the company, which was an attractive feature of his old position, and which continued to be an incident of the positions held by the other organizers of the company, Griffith and Paquet. Griffith testified that he offered Dacey a drawing account of $125 a week, which would have given Dacey a minimum yearly compensation of $6,500, and which was slightly more than his best year's earnings before he went into the service. Dacey testified that he had no recollection of having been offered such a drawing account. Even if a drawing account in that amount was offered, it would still not have rendered the new position one of 'like pay', with the old. This is so because the old position was compensated on a basis of a percentage of the company, which with the expanded earnings would have amounted to considerably more than $6,500 per year- a benefit which, we may assume for purposes of the present point, Dacey would have shared along with Griffith and Paquet had Dacey not gone into the army. Under the Act, the veteran 'does not step back on the seniority escalator at the point he stepped off. He steps back on at the precise point

> he would have occupied had he kept his position continuously during the war.' The
> veteran's 'service in the armed services is counted as service in the plant so that he
> does not lose ground by reason of his absence.'   *Fishgold v. Sullivan Drydock &*
> *Repair Corp.*, supra, 328 U.S. at pages 284, 285, 66 S.Ct. at page 1111.

*Id.* at 419-420.

The second case cited by the plaintiff is *Harris v. City of Montgomery,* 322 F.Supp.2d 1319, 1323 (M.D. Ala., 2004). *Harris*, however, dealt with a violation of Section 4311, not Section 4312.  Accordingly, the court in *Harris* was defining the phrase "benefit of employment," not "like seniority, status and pay."  Further, *Harris* dealt with a demotion which occurred while the plaintiff was still employed, not the failure to re-employ the plaintiff. The plaintiff was a head football coach who was moved into an assistant coaching position after he showed his supervisors his orders to be called up for annual military training.  The court wrote:

> [D]efendants note that Harris's pay has not been reduced and he still holds the
> same official position of Leader I. Harris contends he was denied three benefits of
> employment: (1) he was denied the position of head coach; (2) he was forced to use
> vacation, instead of the military, leave for his time on reserve duty; and (3) he was
> denied a merit-based raise.

*Harris v. City of Montgomery*, 322 F.Supp.2d 1319, 1323 (M.D.Ala.,2004).  The *Harris* case does not support the plaintiff's position.

The plaintiff also cites *Duarte v. Agilent Technologies, Inc.,* 366 F.Supp.2d 1039 (D. Colo. 2005), which does interpret the "like seniority, status and pay" language of USERRA:

> Here, although Duarte's title, pay, and benefits upon his return from active duty in
> July of 2003 were the same as they had been when he was called-up in November
> of 2002, the duties of his job as design consultant were significantly different.
> Specifically, Duarte was no longer the primary design consultant for the EPSG
> group, but rather was providing minimal assistance to other primary design

23

consultants and working on a special project. Although Groninga testified that she considered the benchmarking project to which Duarte was assigned to be important and a great opportunity for him, assignment to this project, as well as serving in an assistant role to other design consultants, resulted in Duarte's diminished status at Agilent.

*Duarte*, 366 F.Supp.2d at 1045-1046.  Unlike *Duarte*, the instant case does not allege that the plaintiff was assigned a position of "diminished status."

The court is persuaded by the language set out in *Woodard v. New York Health and Hospitals Corp.*, 554 F.Supp.2d 329, 355-356 (E.D. N.Y., 2008):

> [C]entral to USERRA's reemployment protections is the "escalator principle," which "requires that the employee be reemployed in a position that reflects with reasonable certainty the pay, benefits, seniority, and other job perquisites, that he or she would have attained if not for the period of [military] service." 20 C.F.R. § 1002.191. This principle, however, permits an employer to take into consideration changes in the workplace during an employee's period of military leave. The USERRA regulations recognize that an employer's reemployment offer may be affected by changes in staffing or work priorities, so long as the returning employee maintains the seniority and job classification she would have held if she been employed during her period of military service. *See* 20 C.F.R. § 1002.194 ("The reemployment position may involve transfer to another shift or location, more or less strenuous working conditions, or changed opportunities for advancement, depending upon the application of the escalator principle."). *See also Long v. Ellis Environmental Group, LC*, No. 3:05cv227, 2007 WL 1020005, at *6 (N.D.Fla. Mar. 30, 2007) (granting summary judgment to employer on § 4312 claim because employee was offered reemployment in a position of similar seniority, pay and status; employer was permitted to offer a job that differed from employee's pre-service job, because the job shift was made necessary by changes in employer's staff and business during the period of military service).

*Woodard v. New York Health and Hospitals Corp.,* 554 F.Supp.2d 329, 355-356 (E.D. N.Y., 2008).

The plaintiff was reinstated to the same seniority and job classification, but he argues that he should have been put to work in the battery barn. Johnson testified, however, that "there is no battery barn job."  (Johnson Depo. 67.)

> There's no permanent position for a battery barn. The battery barn is not a job title,

> it's not a job classification. It is only a task. And "the battery barn" is a slang term used by minors in the operation. It has nothing to do with our contract, bidding jobs, or placing employees on a barn other than job task assignments for various reasons and times.

*Id.* Further, the decision as to the part of the mine to which Cooley was assigned would have been made by his immediate supervisor; such placement was not something Cooley was hired into. *Id.* at 73.

While his shift and work location changed, the plaintiff has not shown that he would have maintained the same shift and work location after applying the escalator principle. There was no violation of Section 4312 when the plaintiff was ultimately re-hired.

## Section 4311

To show a violation of Section 4311, the plaintiff must show that his military service was a motivating factor in the decision not to re-hire him at the face-to-face meeting. To satisfy this burden, the plaintiff argues:

> Defendants have clearly denied Cooley certain benefits of employment. To begin with, they denied him his employment for approximately six-months. They refused to accommodate his disability when they had a statutory duty do so. They then reemployed him in a more strenuous and labor intensive position when his old positions was still available. They brought him back making less pay than he made before he was summoned to active duty.

(Doc. 43-1, p 37.) This paragraph provides no evidence of discriminatory motive, only alleged discriminatory conduct.

The plaintiff next states:

> Lastly, they harassed him because of his reserve commitment and need to seek treatment for psychological issues associated with his military service. (Cooley Dep. pp. 89-90, 97, 110, 115 ).

(Doc. 43-1, p. 37.)

A close examination of the actual evidence cited in support of this statement, however, reflects no specific example of harassment. The plaintiff's deposition reads:

> A.   Well, with regards to Mike Johnson, anytime I would be off for National Guard duty, I would have to take him – I would have to, you know, bring a slip saying, you know, that I had been on Guard.  He always – I worked there primarily the owl shift, so there were times when I couldn't make it to work on Sunday nights after the drill, and he would always give me an unexcused day for that.
>
> Q.   Okay.  What else did you mention to your doctors as far as issues you had with your employer?
>
> A.   He just always seemed hostile toward anything – anything – anything that had to do with the Army or the National Guard or anything, or the fact that I had filed a grievance or had people talking to him about the issue.  He was just hostile about it.

(Doc. 38-4, p. 89-90.)

Requiring a leave slip after Guard duty is not evidence of harassment. Further, the conclusory statement, "always seemed hostile," without specific evidence of hostility, has no probative value. The plaintiff's statement that Johnson threatened to fire him "[b]ecause of excessive absenteeism and going to the doctors", in an of itself, is not evidence of animus towards the plaintiff's military service.  (Doc. 38-4, p. 97-98.)  Cooley states that Johnson said "if I was sick enough to go to the doctor as much as I did, I probably needed to go on disability."   (Doc. 39-4, p 110.)   Cooley also testified to Johnson's "smirk" and "smile" which he felt were malicious in nature.  (Doc. 39-4, p. 115.) These statements do not relate to the plaintiff's military service.

The plaintiff finally states that "[f]urther evidence that Cooley's military service

was a motivating factor in the Defendants decision to deny him these benefits are

derogatory statements Johnson made regarding Cooley's attempts to return to work."

(Doc. 43-1, p 37.)  The plaintiff explained these comments in his deposition:

> A.    And he told me, if I was healthy when I left, I would have to be healthy
> when I returned.
>
> Q.    And what did you say in response?
>
> A.    I said –- I told him I didn't think he was —  that he understood what —
> what I was saying, he understood how —  how USERRA, which is the you
> know, the contract that the soldiers work under when they come back to
> work, I told him I didn't think he understood that.  And he said he — it
> didn't — he didn't care, that's what he had lawyers for.  He wasn't going to
> let me come back to work.

(Doc. 38-4, p. 47-48.)

Despite the mention of USERRA in this quote, Johnson's statement reflects only his

understanding of USERRA and his obligations thereunder, not that the plaintiff's military

service was a motivating factor in the denial of re-employment. The Eleventh Circuit case

of *Coffman v. Chugach Support Services, Inc.*, 411 F.3d 1231, 1239 (11th Cir. 2005) is

instructive on this issue. The Eleventh Circuit upheld a district court's conclusion that the

plaintiff had failed "to present either direct or circumstantial evidence to demonstrate that

Chugach [the defendant] 'relied on, took into account, considered, or conditioned its

decision' not to hire Coffman [the plaintiff] on the basis of his active military service."

*Coffman*, 411 F.3d at 1239.  The court held:

> [A]lthough there was a close proximity in time between Coffman's military service
> and Chugach's decision not to hire him, Chugach had not expressed hostility
> towards service members. In fact, as the district court noted, Chugach hired both
> military and non-military personnel. Also, both Darkow and McCredie testified
> that Chugach did not consider Coffman's military status in its decision not to hire
> Coffman. Furthermore, the district court found that Coffman failed to demonstrate

> any disparate treatment of active military employees compared to other employees
> with similar work records.

*Id.*

Similarly, in the instant case, although there is a close proximity in time between Cooley's military service and the defendant's failure to re-hire him, there is no other evidence, direct or circumstantial, that Jim Walter relied on, took into account, considered, or conditioned its decision not to re-hire the plaintiff because of his military service. The plaintiff presents no evidence that the defendant refused to hire or re-hire other service members. The plaintiff presents no testimony from decision-makers from which it can be concluded that the plaintiff's military service factored into the decision. As in *Coffman*, the plaintiff has failed to demonstrate any disparate treatment of active military employees compared to other employees with similar work records. Accordingly, there is no violation of Section 4311 regarding either the failure to re-employ the plaintiff at the initial meeting or the alleged failure to return the plaintiff to his original position when Jim Walter did re-hire him.[8]

<u>State Law Claiims</u>

*Intentional Infliction of Emotional Distress*

Under Alabama law, in order to prove the tort of intentional infliction of emotional distress, Cooley must show that Jim Walter's conduct "(1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no

---

[8]The plaintiff attempts to argue a constructive discharge claim under USERRA in his reply brief. No such claim was made in the complaint. Accordingly, the court will not address it herein.

reasonable person could be expected to endure it." *Thomas v. BSE Indus. Contractors, Inc.*, 624 So.2d 1041, 1043 (Ala. 1993).

This tort has been applied to "(1) wrongful conduct in the family-burial context; (2) barbaric methods employed to coerce an insurance settlement, and (3) egregious sexual harassment." *Potts v. Hayes*, 771 So. 2d 462, 465 (Ala. 2000). Application of the tort of outrage to the present employment case would be an expansion of the extremely limited tort of outrage under Alabama law.  Further, the evidence before the court does not show conduct which rises to the level of intentional infliction of emotional distress. This claim is due to be dismissed.

### Negligent, Retention, Supervision or Training

To hold Jim Walter liable for negligent retention, supervision or training based on the conduct of Johnson, Cooley must first show that Johnson engaged in unlawful conduct. *University Fed. Credit Union v. Grayson*, 878 So.2d 280, 291 (Ala. 2003). After Cooley has made such showing, he must produce evidence that Jim Walter had notice or knowledge, actual or presumed, of Johnson's incompetency for Jim Walter to be held responsible. *Ledbetter v. United Am. Ins. Co.*, 624 So.2d 1371, 1374 (Ala. 1993). Demonstrating liability on Jim Walter's part requires affirmative evidence that Johnson's alleged incompetence was actually known to Jim Walter or was discoverable by Jim Walter if it had exercised care and proper diligence. *Id.* at 1374.

The plaintiff testified at his deposition that he had no evidence to support this claim.  (Cooley Depo. 28.)  In his response to summary judgment, the plaintiff states only:

> Contrary to the Defendants' contentions, such evidence is present in

29

abundance in this case. Johnson's incompetence is shown by his utter ignorance of the compliance requirements regarding USERRA which was compounded by his apparent disinterest in educating himself about the statute. Johnson testified that he had training on USERRA yet he violated its provisions at almost every turn. Moreover, when given a chance by the Department of Labor to address Cooley's issues Johnson refused to do so.

When Johnson directed the Department of Labor's questions regarding Cooley's complaint to JWR's legal department, JWR was on actual notice about Johnson's ignorance of USERRA and its provisions. Instead of correcting Johnson and getting him training on USERRA's provisions, JWR rejected the Department of Labor's suggestion that the law may have been violated and instead stuck its head in the sand and quoted Americans with Disability Act law to the agency. Johnson's deposition testimony only confirmed that in JWR's universe, the only applicable law in Cooley's situation was the collective bargaining agreement and state Workers Compensation law. Of course, USERRA and its implementing regulations provide otherwise.

(Doc. 42, pp. 46-47.) The complaint with the Department of Labor was filed in July of 2005, well after the events of which the plaintiff complains.

This claim is due to be dismissed.

## DECISION

Based on the foregoing, summary judgment is due to be granted on all of the plaintiff's claims except the USERRA claims, under Section 4312, based on the allegations that the defendant denied Cooley employment at the time of the initial meeting with Johnson.   All other claims of Charles Cooley will be dismissed.   By agreement of the plaintiff, Bernadette Cooley's loss of consortium claim is due to be dismissed.

DONE this 31st day of March, 2010.

Robert R. Armstrong, Jr.
United States Magistrate Judge